THE AUBURN AND CATO PLANK ROAD COMPANY *against* DOUGLASS.

Legislative acts granting franchises to corporations are to be construed strictly, according to their terms; and the grantees in such acts take nothing by implication, either as against the power making the grant, or against other corporations or individuals.

The acts authorizing the formation of plank road companies give to such companies no interest or easement in or upon the lands adjoining their road, and no right to restrict the use which the proprietor of such lands may make of his own premises.

The owner of land may put it to any use which does not infringe some fixed legal right of another; loss or damage to one person, arising from the use made by another of his own property, being *damnum absque injuria*, unless the former has previously acquired some legal right to restrict the use which the latter shall make of such property.

Where no such right of restriction exists, it is immaterial what may be the motives of the proprietor for dealing with his own property in a particular way.

THE plaintiffs, a corporation organized under the general plank road acts, had built their road upon the line of an old highway which bounded the defendant's farm on one side, and had erected a toll-gate on that part of their road which ran by his farm. After the erection of the gate the defendant moved his fence from the line of the road where it originally stood, back upon his farm some twenty or thirty feet, and graded a track by the side of the road, but entirely upon his own land, extending on both sides of the toll-gate, so that persons traveling upon the road could, if disposed, leave the road and pass over this parallel track, thus avoiding the gate.

The complaint states these facts, and avers that the acts of the defendant were done for the purpose and with the intent to injure and defraud the plaintiffs; and prays for an injunction, together with damages for the injury sustained. The answer denies the motives imputed to the defendant in the complaint, and insists that the fence was removed and

the track graded to facilitate his farming operations, and to afford him convenient ingress and egress to and from his barn and other premises; such improvements having been made necessary by the acts of the plaintiffs themselves, in cutting down the old highway several feet, and leaving high banks in front of his barn, pasture and house. To this answer the plaintiffs demurred.

The cause was heard before Mr. Justice JOHNSON at the Cayuga special term, in April, 1850. Judgment was given for the plaintiffs on the demurrer, and the defendant was perpetually enjoined from permitting his road to be kept open so that it might be used by the public for travel. (12 *Barb.*, 553.) The judgment was affirmed at general term, and the defendant appealed.

*P. Bronson* for the appellant.

*John Porter* for the respondents.

SELDEN, J. The plaintiffs in this case must rest their claim to restrict the defendant in the use which he shall make of his own property upon one of two grounds, viz., 1. That the case is within the scope of that maxim of the common law which requires every man so to use his own property as not to inflict injury upon others; or 2. That the statute which creates the plaintiffs' franchise impliedly enacts whatever is necessary to protect them in its enjoyment. Unless this action can be sustained upon one of these grounds, there is no sound legal principle upon which it can rest. In regard then to the first: The maxim *sic utere tuo ut alienum non lædas* is iterated and reiterated in our books, and yet there is scarcely an aphorism known to the law the true application of which is more vague and undefined. Interpreted literally it would enjoin a man against any use of his own property which in its consequences might injuriously affect the interests of others; but no such

legal principle ever existed. The affairs of life could not well be conducted under the restraints of such a rule. On the contrary every proprietor has absolute control over his own property, and may do with it whatever he pleases, unless he thereby infringes some fixed legal right of another. Loss or damage to one person arising from the use made by another of his own property is *damnum absque injuria*, and affords no ground of action.

While, therefore, *sic utere tuo*, &c., may be a very good moral precept, it is utterly useless as a legal maxim. It determines no right; it defines no obligation. The cases to which the maxim has been generally applied are those where the owner of one tenement does some act upon his own premises which injuriously affects the interests of the proprietor of an adjoining tenement.

A review of the cases will show that in every action brought to recover for or to prevent such an injury it is indispensable for the plaintiff to show that he has previously acquired, by grant, by prescription or otherwise, some right which operates to curtail the absolute dominion which the defendant would otherwise have over his own tenement. In other words, he must be entitled to an easement, or that which is equivalent to an easement, in the tenement of the defendant, or he is without remedy, however serious may be the damage he sustains. There is a remarkable uniformity in the cases on this subject. Although too numerous to be referred to in detail, it will serve to illustrate the precision and undeviating consistency of the rule to advert to one or two of the more prominent classes of cases to which the maxim in question has been supposed to apply. Cases which relate to the obstruction of windows constitute one of these classes. Every proprietor of land has a natural right to so much light as falls perpendicularly upon his own soil, and no more. His rights in this respect, are defined by the legal maxim, *cujus est solum, ejus est usque ad cœlum.* Whatever right, therefore, he may have to receive light

laterally over the land of others is an easement or some-thing equivalent to an easement. It is a right which may be acquired by covenant or by prescription if not by grant, and which, however acquired, extends beyond the limits of his own land, and rests as a burden or restriction upon the rights of the adjoining proprietor. ( *Gale & Whatley*, 131, 2.) It is abundantly settled that it is only where an owner has acquired such an easement in his neighbor's land that he can have any protection from the law for his windows, whatever that neighbor may do upon his own land. ( *Cox* v. *Matthews*, 1 *Vent.*, 239; *Palmer* v. *Fletcher*, 1 *Lev.*, 122; *Story* v. *Odin*, 12 *Mass.*, 157; *Mahan* v. *Brown*, 13 *Wend.*, 261.)

The plaintiff in the last of these cases invoked the aid of the maxim, *sic utere tuo*, &c. SAVAGE, Ch. J., on this subject, says: " The present is not a case of ancient lights. It is not contended that the action can be sustained upon that ground, but upon the principle that no one shall so use his own property as to injure another." * * * " The defendant has not so used his own property as to injure another. No one, legally speaking, is injured or damnified unless *some right is infringed*."

In England, after twenty years' uninterrupted use of a window, a right to its enjoyment is presumed ; and this right the law will protect. But the rule is otherwise in this state. ( *Parker* v. *Foote*, 19 *Wend.*, 309.) This discrepancy, however, does not affect the present argument.

The next class of cases to which I will refer is, actions for injuries to buildings, &c., resulting from excavations, tearing down of buildings, or other acts done upon adjoining premises. In regard to all cases of this kind the rule has been inflexibly adhered to that unless the party injured had previously acquired, by grant, prescription or otherwise, an easement in the adjoining tenement, that is, a right to restrict the use which the proprietor of such adjoining tene-ment should make of his property, no action would lie for

acts done by such proprietor upon his own land, however great the damage caused thereby. I will cite a few only of the numerous cases by which this doctrine is established In *Wyatt* v. *Harrison* (3 *Barn. & Adolph.*, 871), the plaintiff and defendant owned adjoining lots, and the defendant dug on his own lot so near the plaintiff's house that it fell down. It was held that the plaintiff could not recover. In *Partridge* v. *Scott* (3 *Mees. & Wels.*, 220), the question was very elaborately considered and the same conclusion arrived at. Baron ALDERSON says : " Rights of this sort, if they can be established at all, must, we think, have their origin in grant. If a man builds his house at the extremity of his land, he does not thereby acquire any right or easement, for support or otherwise, over the land of his neighbors."

In a case in our own courts (*Lasala* v. *Holbrook*, 4 *Paige*, 169), it was held by Chancellor WALWORTH that the proprietors of a church in the city of New-York which had stood for thirty-eight years were not entitled to an injunction against an adjoining proprietor who was engaged in excavating on his own lot to a depth far below the foundation of the church, so as to endanger the walls of the latter, which had already begun to settle. But the case in which the doctrine for which I contend is most explicitly stated is that of *Thurston* v. *Hancock and others* (12 *Mass.*, 220). That was an action on the case for digging away the earth upon the adjoining land and undermining the plaintiff's house. PARKER, Ch. J., said : " It is a common principle of the civil and of the common law that the proprietor of land, unless restrained by covenant or custom, has the *entire dominion*, not only of the soil but of the space above and below the surface, to any extent he may choose to occupy it. The law, founded upon principles of reason and common utility, has admitted a qualification to this dominion, restricting the proprietor so to use his own as not to injure the property or impair any *actual existing rights* of another. *Sic utere tuo ut alienum non lœdas.*"    *    *    *

Auburn and Cato Plank Road Co. *against* Douglass.

"But this subjection of the use of a man's own property to the convenience of his neighbor *is founded upon a supposed preëxisting right in his neighbor to have and enjoy the privilege which by such act is impaired.*"

It is unnecessary to pursue this point further. An examination of all the various classes of cases to which the maxim *sic utere tuo*, &c., has been applied, would only serve more conclusively to demonstrate that the maxim has never prevailed so as to sustain an action to recover for acts done by the defendant exclusively upon his own land, except where the plaintiff has acquired an easement in the tenement of the defendant, that is, a right extending beyond the limits of his own premises, and rendering his neighbor's tenement subservient to his. The true meaning of the maxim, when applied to cases of this sort, is simply this, that one who owns a tenement which is subject to a servitude to another tenement must take care so to manage his own as not directly to infringe the rights of the owner of the dominant tenement.

But the complaint in this case alleges that the acts of the defendant were done for the express purpose of injuring the plaintiffs; and it may be said that there is a distinction between acts done by a proprietor upon his own premises in good faith for his own benefit, and those which are designed to injure his neighbor. The question is here distinctly presented, whether an individual who uses his own property in a manner which would be otherwise lawful, subjects himself to an action if his motive in so using it was to injure another. My researches have not enabled me to find much in the way of authority bearing directly on this question. There is a passage in *Domat* which seems to imply that such a distinction is recognized by the civil law; but I have looked in vain for any recognition of such a rule by the common law. The contrary was expressly held by the late supreme court in this state, in the case of *Mahan* v. *Brown*, before cited. The

plaintiff there claimed the right to be protected in the enjoyment of her windows upon the ground that the obstruction was wanton and malicious and with a view to injure. Chief Justice SAVAGE in that case says: "But before sufficient time has elapsed to raise a presumption of a grant, a party has no right, and can maintain no action for being deprived of that easement, let the motive of the deprivation be what it may." Again he says: "The plaintiff in this case has only been refused the use of that which did not belong to her; and whether the motive of the defendant be good or bad, she has no *legal* cause of complaint." So in the case of *The Newburgh Turnpike Company* v. *Miller* (5 *John. Ch. R.*, 101), where a similar question arose, Chancellor KENT says: "The *quo animo* is not an essential inquiry in the case."

But, independent of authority, if a malignant motive is sufficient to make a man's dealings with his own property, when accompanied by damage to another, actionable, where is the principle to stop? It will be found to apply to a thousand other cases with the same force as to this. For instance, if a man sets up a trade, not with a view to his own profit, but solely to injure one already established in the same trade, how can the case be distinguished in principle from this? So, if one compels his debtor to pay, not because he wants the money, but that the latter may call upon his debtor, and thus ruin him; or if one who holds stock in an incorporated company, with a view to depreciate the stock and thus injure some other holder, throws his stock upon the market and sells at a great sacrifice; would not these cases fall within the same principle? and yet no one would contend that an action would lie in these or similar cases.

I hold it to be clear that this action cannot be maintained upon the ground that the motive of the defendant in doing the acts complained of was malicious. This, with what has been before said, strips the cause of every support upon

which it can be rested, save one. It may be claimed that it is indispensable to the enjoyment of the franchise granted to the plaintiffs that it should be protected from acts like those of the defendant which tend to render it valueless; that it is incident to every grant of a franchise that the grantor should have the right to protect it from destruction; and that if the act of the legislature creating the franchise omits to confer in express terms the rights and powers necessary to that protection, they must necessarily be implied as essential to and inherent in the nature of the thing granted.

If the extent of the plaintiffs' franchise is to be determined by the terms of their charter, then all the rights they have are, to acquire the right of way for their road, lay down their plank, and set up a toll gate and receive tolls. There is not a word in the plank road law giving them any exclusive privilege whatever; or any rights as against adjoining proprietors. Do they take such rights by implication? This presents, as I conceive, the only debatable question in the case. It is not a new question, but one which has received the most elaborate discussion. It involves the great question whether acts of the legislative power, conferring special privileges and parceling out the sovereign rights of the people, are to be construed strictly according to their terms, or liberally with a view to make the grant as beneficial as possible to the grantee; whether corporations are to be content with what is expressly conceded to them by their charters, or are to encroach beyond the terms of those charters upon the legislative power, and upon the rights of individuals, and to take by implication whatever may be necessary or convenient for the exercise or essential to the value of their corporate rights. The question has been repeatedly before our courts, and our judges have divided upon it according to the natural bias and tendency of their minds. Chancellor KENT, in the two cases of *The Croton Turnpike Co.* v. *Ryder and others* ( 1 *John. Ch. R.*, 611 ), and *The Newburgh Turnpike Co.* v. *Miller* ( 5 *John. Ch. R.*, 101 ),

adopted the latitudinarian view of corporate rights, and sustained the bills. The grounds upon which the decisions in these cases rest are not very distinctly set forth in the cases themselves; but the learned chancellor in his Commentaries has stated the principles adopted by him in those cases with clearness and precision. He says: "If the creation of the franchise be not declared to be exclusive, yet it is necessarily *implied in the grant*, as in the case of the grant of a ferry or bridge, turnpike or railroad, that the government will not, either directly or indirectly, interfere with it so as to destroy or materially impair its value. Every such interference, whether it be by the creation of a rival franchise or otherwise, would be in violation or in fraud of the grant. All grants or franchises ought to be so construed as to give them due effect by excluding all contiguous competition which would be injurious and operate fraudulently upon the grant;" and he refers in a note to the case of *The Newburgh Turnpike Co.* v. *Miller*, among others, as illustrating the principle advanced in the text. (3 *Kent's Com.*, 459, *note*.) But this doctrine of the extension of a franchise by implication was overthrown in the great case of *The Charles River Bridge* v. *Warren Bridge* (11 *Peters*, 420). In that case the legislature of the State of Massachusetts, in 1785, had incorporated a company to build a bridge over Charles river, granting them power to receive tolls. The bridge was built and the company enjoyed the tolls until 1828, when the legislature incorporated another company with power to build another bridge across the same river near the former bridge, and also to take tolls. The charter to the first company did not give them in express terms any exclusive right. They filed their bill to prevent the erection of the second bridge. The supreme court of Massachusetts dismissed the bill, and on appeal to the supreme court of the United States their decision was affirmed. Chancellor KENT's Commentaries, and his decision in the case of *The Newburgh Turnpike Co.* v. *Miller*, were both cited upon the

argument; but the court in the most explicit terms overrule the whole doctrine of the learned chancellor. Chief Justice TANEY, in giving the opinion of the court, says: "It would present a singular spectacle if, while the courts in England are restraining within the strictest limits the spirit of monopoly and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given to them in their charters, the courts in this country should be found enlarging these privileges by implication." Again he says: "And what would be the fruits of this doctrine of implied contracts on the part of the states, and of property *in a line of travel* by a corporation, if it should now be sanctioned by this court? To what results would it lead us? If it is to be found in the charter to this bridge, the same process of reasoning must discover it in the various acts which have been passed within the last forty years for turnpike companies; and what is to be the extent of the privilege of exclusion on the different sides of the road?" The principles of this case have been adopted in Virginia in the case of *The Tuckahoe Canal Co.* v. *The Tuckahoe R. R. Co.* (11 *Leigh*, 42), in Connecticut in the case of *The Enfield Toll Bridge Co.* v. *The Hartford & New Haven R. R. Co.* (17 *Conn.*, 454), and in this state in *The Oswego Falls Bridge Co.* v. *Fish and others* (1 *Barb. Ch. R.*, 547), and in *Thompson* v. *The New-York & Harlem R. R. Co.* (3 *Sandf. Ch. R.*, 625).

Chancellor KENT admits, in one of the later editions of his Commentaries, that these cases have entirely subverted the doctrines advanced by him. (*See* 3 *Kent's Com.*, 459, *in note*; *also Greenl. Cruise, tit. Franchises,* § 29.)

If then, as established by these cases, a corporation is strictly confined to the privileges conferred by its charter, and can take no implied rights as against the law-making power, *a fortiori* should it not be permitted to encroach by implication upon the rights of individuals who are in no respect parties to the compact between the legislature and

such corporation. The right claimed by the plaintiffs in this case is a right to restrict the defendant in the use he shall make of his own premises, for the reason that unless he is so restricted their franchise will be rendered less valuable. This restriction, if it exists at all, is virtually an easement in the defendant's land; it is a burden resting upon it for the benefit of this corporation. How was such a right acquired? Has the legislature conferred it? Certainly not, except by implication, and since it cannot be implied that the legislature has bound itself not to charter another road directly by the side of and adjoining to that of the plaintiff, it will scarcely be inferred, I apprehend, without a word said on the subject, that it was not intended to transfer to the plaintiffs or to curtail for their benefit any portion of that absolute right of dominion which the defendant would otherwise enjoy over his own property. It is clear that the rights claimed by the plaintiffs in this case cannot exist consistently with the principles established in the case of *The Charles River Bridge* (*supra*). There is, however, another class of cases, which, without a word or two in explanation, might be supposed to uphold the plaintiffs' claim. It has been repeatedly held in England that when one person is entitled by prescription or by grant from the crown to a ferry, if another person establishes a ferry near to the first he is liable to an action at the suit of the proprietor of the first ferry. Chancellor KENT refers to this class of cases to sustain his decision in the two cases above referred to; but if he had examined the reasons upon which the English cases are based, he would have seen that they afford no support whatever to the doctrine advanced by him. Those cases rest upon the ground that a public ferry is a franchise requiring a grant from the crown; and consequently, that the establishment of a second ferry, without such a grant, is a usurpation and a public nuisance, which like every other nuisance of that kind subjects the party not only to a public prosecution, but to a private suit by any person

specially injured thereby. That this is so, is shown by the most marked case on the subject in the English books, to wit, that of *Blissett* v. *Hart* (*Willes*, 508). It was an action on the case for erecting another ferry near to Bablock Hithe Ferry, of which plaintiff was siezed. The court sustained the action, and the reasons given were as follows: "A ferry is *publici juris*. It is a franchise that no one can erect without a license from the crown; and when one is erected, another cannot be erected without an *ad quod damnum*. If a second is erected without a license, the crown has a remedy by a *quo warranto*, and the former grantee has a remedy by action." This class of cases, therefore, simply shows that if an individual or company should, without authority from the legislature, build another plank road so near as to interfere with the plaintiffs' road, and should set up a gate and levy tolls upon the traveling public, the plaintiffs as well as the people would have a remedy by action. But they have no bearing upon a case where the acts complained of do not in any way infringe the rights of sovereignty vested in the people.

I see no ground whatever, therefore, upon which this action can be sustained, admitting all the allegations contained in the complaint to be true. This renders it unnecessary to consider the question raised upon the answer. It may be added that the plank road acts give to the corporation in cases of this kind a remedy against those who avail themselves of the facilities afforded by the adjoining proprietors. Every traveler upon a plank road who passes around or avoids the gate of the company for the purpose of evading the payment of toll subjects himself to a penalty at the suit of the corporation. If this remedy be not sufficient, it is for the legislature to provide some other. The courts cannot with propriety be called upon, however strong the apparent equity of the case, to adopt the novel principle that the motives with which a man conducts his own business or deals with his own property may be inquired into,

in order to hold him responsible for the consequences to another, when he has violated no law nor any established legal right of the party injured.

The judgment of the supreme court must be reversed.

The whole court concurring,

Judgment reversed.