John McCutchen *v.* O. M. Blanton et al.

Injunction. *Nuisance. Pernicious grass.*

> Whether a tenant in fee can be enjoined from planting pernicious grass on his land by the owners of adjacent farms which it will injure, .*quære;* but the injunction against the alleged nuisance will not be sustained at the final hearing if the testimony is conflicting as to the character and effects of the grass, and leaves in doubt the result of its introduction into agriculture.

Appeal from the Chancery Court of Washington County.

Hon. W. G. Phelps, Chancellor.

*W. P. & J. B. Harris*, for the appellant.

According to the allegations of the bill, the grass is not of the class of objects which takes its character as a nuisance from its locality, as, for instance, a powder-mill; but it is characterized as a public evil in agricultural districts wherever and by whomsoever introduced. It follows from the theory of the complainants that all farmers may treat its introduction as an indictable offence, and have recourse to an injunction. The evidence, however, shows that for grazing and forage the grass is valuable, and is likely to supply these much-needed adjuncts to the agriculture of the State. So strong is the proof upon this point that it gives rise in any rational mind to a desire to see the product tried effectually and under favorable auspices. Occupying this attitude, to justify interference by public authority with its culture, its introduction should be clearly shown to be attended with inevitable and irreparable evil. The evidence upon this point is conflicting. Private persons, who enjoin an alleged public nuisance which is not such *per se*, must show that they have sustained, and will continue to sustain, injury differing in kind, not in degree, from that affecting

the public at large. *Green* v. *Lake*, 54 Miss. 540 ; *Mississippi Railroad Co.* v. *Ward*, 2 Black, 485. Balancing the opinions based on diverse experiences of the witnesses results here in a mere opinion concerning an untried experiment, without experience in this specific case, and it is going too far to declare the use a nuisance which will affect the complainants in a manner exceptional in kind. Although this grass has grown in many countries, no court or legislature has acted on the subject. Whether it is a mischief remains a matter of pure speculation, and this doubt is an insuperable obstacle to relief. Wood on Nuisances, 839. Freedom of industry, unrestricted dominion, and the use of one's own, are essential to the progress of society, whose paramount interests alone justify the imposition of restraints on its members in the enjoyment of their property, and the projection of enterprises. The fears of mankind, though reasonable, will not create a nuisance. *Anon.*, 3 Atk. 750. An injunction will not be granted to restrain an eventual or contingent nuisance, or one which justifies conflicting opinions whether the danger apprehended will ever be realized. *Butler* v. *Rogers*, 9 N. J. Eq. 487 ; *Ripon* v. *Hobart*, 3 Myl. & K. 169. Probable diminution in value of adjacent property is not sufficient cause for enjoining the lawful use of one's estate. *Attorney General* v. *Nichol*, 16 Ves. 338 ; *Fishmongers' Co.* v. *East India Co.*, 1 Dick. 163 ; 2 Story Eq. Jur. § 925, *et seq.;* Hilliard on Injunctions, 271. Nuisances will be enjoined only in cases of absolute necessity, where the evil to be prevented is not only probable, but certain and inevitable. *Harrison* v. *Brooks*, 20 Ga. 537 ; *Rhodes* v. *Dunbar*, 57 Penn. St. 274 ; *Barnes* v. *Calhoun*, 2 Ired. Eq. 199 ; Kerr on Injunctions, 340.

*W. P. Harris*, on the same side, argued orally.

*Rucks & Jayne*, on the same side.

If this grass is what the appellees' witnesses describe, the injunction is useless. A wind from Arkansas may bring a seed, or a bird from Alabama the joint of a root, and in ten years Mississippi will be one field of Johnson grass, seventeen feet high. Courts are powerless against its baleful effects. If a doubt exists as to the reality of the apprehended danger, it is fatal to the injunction. *Green* v. *Lake*, 54 Miss. 540 ; Wood on Nuisances, § 787. Other witnesses think that the grass

spreads slowly, and is easily eradicated. On conflicting evidence the injunction will not be sustained. 2 Story Eq. Jur. § 924 *a*. Moreover, the appellees, who will only be involved in a common labyrinth, sustain no exceptional injury, and are, for this reason, not entitled to relief. Wood on Nuisances, §§ 2, 9. The stories of the wonderful vitality of this grass, which are incredible, are not so clearly made out by satisfactory evidence as to justify the court in preventing the appellant from making hay upon his own land. If it really grows so luxuriantly, it may be doubted whether it is not a better crop than cotton.

*Nugent & McWillie*, for the appellees.

An insolvent land-owner cannot convert his property into a nuisance to the injury of his neighbors. Irreparable injury, which cannot be compensated, is the foundation of the jurisdiction. While the case must be urgent, and the proof clear, to warrant an injunction before the complainant has established at law the existence of the nuisance, yet, in some cases, especially if the thing is a nuisance *per se*. relief will be granted without a verdict. *Green* v. *Lake*, 54 Miss. 540; *Ripon* v. *Hobart*, 3 Myl. & K. 169; High on Injunctions, §§ 485, 489; 2 Story Eq. Jur. §§ 925, 926. Prevention of the interminable litigation which will result, is another reason for enjoining the planting of this grass. Flying through the air, carried by birds and cattle, or by rail, it germinates, and, permeating the ground in all directions, sends up shoots from every joint. Minute particles of the roots spring into life wherever they fall. It can be destroyed only by being buried under salt, burned with petroleum, and parched in the sun. What precautions can guard against such a pest? It costs more than the land is worth to eradicate it; and, if one particle is dropped on land, a large area soon becomes a mass of cane-like roots several feet deep and useless for agricultural purposes. Plowing the land only causes it to grow more luxuriantly. The grass is a calamity which should be restrained by public authority. It is coarse, eight feet high, useless, and an enemy to the farmer. The railroad running through contiguous places will carry the infection into them all, and floods will soon spread it over the alluvial lands near the Mississippi River. It may injure

the source of the cotton supply of the world.   The facts speak for themselves ; and this court, in view of all the evidence, cannot say that the Chancellor erred.

*W. L. Nugent*, on the same side, argued orally.

Campbell, J., delivered the opinion of the court.

This is an appeal from the refusal of the Chancellor to dissolve the injunction which had been granted in the cause.  By the agreement of the parties the case is to be considered and treated as if submitted on final hearing and disposition on its merits.   The gravamen of the bill is that the defendant (appellant) is about to sow on his land contiguous to or in the vicinity of lands of the complainants Johnson grass seed, which is averred to be most pernicious seed, and will surely cause the lands of the complainants to be overrun with this grass, whereby they will be rendered unfit for other purposes, and unsuitable for the production of cotton, corn, and other crops usually produced in the country ; and that this will constitute a nuisance for which the defendant cannot respond in damages because of his insolvency.  The answer admits that the defendant was about to sow on his land the kind of seed mentioned, but denies its pernicious character as charged, and that his sowing the seed will produce the result alleged by the bill, and claims the right in the defendant to sow the seed.   A great mass of testimony was taken and is now before us, and has received due attention.

The precise limits of one's liberty to do as he pleases with his own property it is often difficult to define.   It may be said that this liberty stops just at the point where the rights of others begin ; but the inquiry arises, What are the rights of others which operate to restrict the exercise of one's dominion over his own property ?   That every man's right to exercise exclusive dominion over his own property, and to make such use of it as he pleases, is subject to some qualification by reason of his social relations, and for the conservation of the just rights of all the members of society, is an established principle in the law of property.   As to some things, the adjudications of the courts in England and America define the limits of the conflicting rights of individuals, but, beyond the rules thus

laid down, there is much uncertainty. An oft-repeated apho-
rism is, *Sic utere tuo ut alienum non lædas;* but this is an uncer-
tain guide in the determination of conflicting claims, for against
it stands the maxim, equally entitled to observance, *Qui jure
suo utitur neminem lædit.* The Court of Appeals of New York,
in its opinion in *Auburn Plank Road Co.* v. *Douglass,* 9 N. Y.
444, said : " While therefore *sic utere tuo,* &c., may be a very
good moral precept, it is utterly useless as a legal maxim. It
determines no right; it defines no obligation." In *Fisher* v.
*Clark,* 41 Barb. 329, the Supreme Court of New York used
this language : One's " right to use his property as he pleases
is unlimited and unqualified, up to the point where the particu-
lar use becomes a nuisance." What is a nuisance has fre-
quently been announced, but whether a particular thing is a
nuisance is often hard to decide.

Many things have been decided to be nuisances, and as to
them we have a guide, but we can find no precedent for the
case at bar. In the case cited above, the Court of Appeals of
New York said : " The maxim *sic utere tuo ut alienum non
lædas* is iterated and reiterated in our books, and yet there is
scarcely an aphorism known to the law the true application of
which is more vague and undefined. Interpreted literally, it
would enjoin a man against any use of his own property which
in its consequences might injuriously affect the interests of
others; but no such legal principle ever existed. The affairs
of life could not well be conducted under the restraints of such
a rule. On the contrary, every proprietor has absolute con-
trol over his own property, and may do with it whatever he
pleases, unless he thereby infringes some fixed legal right of
another. Loss or damage to one person arising from the use
made by another of his own property is *damnum absque injuria,*
and affords no ground of action." " Every person has a right to
the reasonable enjoyment of his property, and so long as the
use to which he devotes it violates no rights of another, how-
ever much damage others may sustain therefrom, his use is
lawful, and it is *damnum absque injuria.*" Wood on Nui-
sances, § 2. To constitute a nuisance there must be a vio-
lation of the rights of others.

How far every one has the right to plant in his own soil

anything he pleases, which is useful and beneficial, although
the natural and probable consequence may be its spreading to
the adjacent lands of others by the operation of what may be
called natural causes, is, so far as we can learn, undecided by
any court.   No case involving this question has been found.
A tenant has been enjoined at the suit of the owner of the
reversion from committing waste by sowing the land in per-
nicious seed.   *Pratt* v. *Brett*, 2 Mad. Ch. 62.   A railroad
company was enjoined from planting willow trees on its right of
way for the purpose of making a fence (*Brock* v. *Connecticut &
Passumpsic Rivers Railroad Co.*, 35 Vt. 373), but the court
placed its decision on the ground that, in conferring the right
of way over the land, it was not " contemplated that the
road was to be fenced in this unusual and extraordinary
manner, in a way that should virtually destroy or render
nearly worthless an amount of land along the sides of the
road nearly, if not quite, equal to the amount taken, and
that, too, by the introduction into the farms of the willow
tree, which some of the witnesses represent as the common
enemy of the farmer in that vicinity, and one with which
they have been contending half their lives, a tree that most
of the witnesses seem to consider as injurious to the surround-
ing land to an extent beyond that of most other trees."   The
court further said :  " Whether one of two adjoining land-
owners, holding their titles in fee, and for the ordinary pur-
poses of cultivation, would have the right to construct a fence
in this manner on the line between them, to the manifest
injury of the other, is a question we are not now called upon
to decide."   But in this case we have a controversy between
proprietors of the fee sustaining no other relation to each other
than ownership of neighboring lands imposes as to the right
of one to plant in his own soil.   Certainly the complainants in
this case have the right to devote their lands to cotton, corn, or
other products, and to preserve them for the continued pro-
duction of such crops.   Perhaps the appellant has the same
right to devote his land to a valuable and useful grass, even if
his doing so shall ultimately cause the adjacent lands of others
to be converted into grass-fields, by causes other than his
direct agency to produce such a result.   We are met by con-

flicting rights. There must be a balancing of them. There should be no restriction of the just right of one further than is necessary to protect another in the enjoyment of his. It may be an incident of the social state and contiguity of territory that each owner must bear the consequence of the exercise of the right of every other proprietor to pursue that particular kind of agriculture he may choose. It may be that unlimited freedom in this respect to each proprietor is the surest guarantee of the good of all. We will not decide this now, but content ourselves with the suggestions made, and place our conclusion on other grounds as sufficient to sustain it.

The principle on which the preventive aid of courts is rendered against threatened injury is well understood. The difficulty is in its application, and this difficulty is greatly increased by the novelty of this case. Great caution should be used in dealing with a matter so delicate and difficult. Every doubt should be solved against the restraint of a proprietor in the use of his own property for a purpose seemingly lawful, and conducive both to individual gain and the general welfare. Relief by injunction is so severe in its consequences that it is not to be granted in such a case, except when the right to it is clearly and conclusively made out. To interfere with one's right to use his own land for the production of what he pleases, in a case of doubt, would be a flagrant abuse of power. It is not enough to show a probable or contingent injury, but it must be shown to be inevitable and undoubted. Wood on Nuisances, § 6 ; *Green* v. *Lake,* 54 Miss. 540.

The voluminous testimony of the many witnesses in this case is quite variant. It is clearly shown that the Johnson grass is very valuable. It makes excellent hay, in large quantity per acre, yielding as much as six tons a year on good land, and seems suited to supply a long felt want of the South. Statements and opinions differ widely as to the spreading of the grass, and its destructibility, and its destructiveness of other crops. According to some of the witnesses, it is an unmitigated curse, threatening ruin to the land as to all else, obtruding itself persistently where it is not wanted, carried far and wide by wind and water and birds and animals, and sending forth its pernicious roots full of joints close together, and each possessing

the germ of a new growth to form the fruitful cause of further propagation by seeds and roots in all the adjacent land, bidding defiance to all efforts to stay its dreaded march of destruction, and soon taking exclusive occupancy of whole plantations, which are thenceforth rendered unfit for anything else. According to others, it is not disposed to spread rapidly, and is hard to propagate, even with diligent effort, and is not destructive of other crops, and may be readily destroyed by the means used to destroy other grass. It is said to have been brought from Guinea, on the Western Coast of Africa, to Jamaica, whence it was taken to South Carolina, from which some of its roots were brought more than forty years ago to Alabama by Mr. Johnson, from whom it has its present name. We have before us the testimony of many witnesses acquainted with it on the Johnson farm in Alabama, and they differ about it, as do witnesses who have known it elsewhere.

We are embarrassed by the contrariety of statements and opinions, and the uncertainty thus created. If we maintain the injunction wrongfully, great harm may be thereby done to the appellant and the country. If future developments shall place it beyond doubt that the grass is an evil to be prevented and extirpated, a remedy may perhaps be found. As at present advised, we regard the result of sowing the grass seed too doubtful, uncertain, and contingent to justify the continuance of the injunction. The history and habits of the grass are too little known and established to authorize its condemnation as a nuisance, which is necessary to sustain this bill. The grass may be neither an unmixed evil or good. Time and trial will disclose its true character. If it be said it will be too late, after its introduction into the country, to stay the evil, if it shall prove to be such, the reply is that it is already in many places in Mississippi and Arkansas, and is in Washington county; and, if its character is correctly portrayed by some of the witnesses, it must soon have the exclusive occupancy of the whole land, and the dissolution of this injunction will exert little influence on this inevitable result. We therefore reverse the decree of the Chancellor, and dismiss the bill without prejudice to the rights of the complainants in any future controversy on this subject.        *Decree accordingly.*