GUY W. BEARDSLEY, Appellant, *v.* WILLIS SHARPE KILMER and JEROME B. HADSELL, Respondents.

Third Department, March 17, 1922.

Torts — competing newspaper established and published for avowed purpose of injuring plaintiff, editor of another paper — competition not unlawfully conducted — plaintiff's paper forced out of business by competition causing plaintiff to lose position and salary — plaintiff has no cause of action.

An editor, manager and part owner of a newspaper has no cause of action against the owners and managers of another newspaper which was established and published for the avowed purpose of injuring the plaintiff, which injury was to be effected by forcing the plaintiff's paper out of business solely by honest competition, though it appeared that the plaintiff's paper began to lose business shortly after the defendants' paper was established and continued in the decline until it was sold for its debts which resulted in the plaintiff's losing his position and salary.

The plaintiff's cause of action fails for three reasons: *First.* The acts of competition complained of were not rendered unlawful by the malicious intention of the defendants to injure the plaintiff by performing them. *Second.* The defendants by their acts interfered with no legal rights possessed by the plaintiff or his employer. *Third.* The acts of competition complained of were not oppressive or unfair and were fully justified as an exercise of the lawful right of competition.

The acts complained of did not become unlawful or actionable because the persons engaged therein " conspired " to commit them.

HINMAN, J., dissents, with memorandum.

· APPEAL by the plaintiff, Guy W. Beardsley, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Broome on the 14th day of October, 1916, upon the dismissal of the complaint by direction of the court at the close of the plaintiff's case.

*Stanchfield, Lovell, Falck & Sayles* [*Halsey Sayles* of counsel], for the appellant.

*Curtiss, Keenan & Tuthill* [*Lewis E. Carr* of counsel], for the respondents.

H. T. KELLOGG, J.:

This action is novel in character. The plaintiff was editor, manager and part owner of a newspaper, known as the *Evening Herald,* which was published in Binghamton, N. Y. The defendant Willis Sharpe Kilmer and his father, Jonas M. Kilmer, were the owners of the business of " Dr. Kilmer and Company," which manufactured and sold a certain kidney remedy known as " Swamp Root." These gentlemen, through extensive advertisement, business genius and, perhaps, through the intrinsic merit of the drug, marketed " Swamp Root " through a series of years with remarkable success. They became rich and conspicuous citizens in their home city of Binghamton, N. Y. The plaintiff in the columns of his newspaper frequently made derisive comments upon the nature of their business. To him the Kilmers were the manufacturers and purveyors of " quack medicines " rather than men of distinction in the social and business world. Their pet remedy was " Swamp Rot " or " Rump Swat," and not a benignant drug, efficacious in disorders of the kidneys. He did not stop with ridicule of the remedy; he proceeded to feature the Kilmers as greatly as possible in ways injurious to their pride. He exploited their marital troubles, their unpleasant litigations, the misfortunes of their relatives. It is not surprising, therefore, that the Kilmers, with their confidential agent, the defendant Jerome B. Hadsell, in the year 1904 determined to enter upon the newspaper field. There is much to indicate that the animating purpose of the undertaking was a desire to square accounts with the plaintiff. As far back as 1895 Willis Kilmer said to the plaintiff concerning the publication of a certain article by him: " That is a God damned pretty state of affairs, and I will tell you right now, I will get even with you for that some time." In 1903, after the plaintiff had again published about the Kilmers a somewhat scurrilous article, Willis Kilmer, meeting the plaintiff upon the street, threatened to horsewhip him, saying: " I will get even with you, * * * you are not through with me. I will get even with you." A friend of the Kilmers and of the plaintiff

attempted to dissuade the Kilmers from entering into the newspaper business. He asked Willis Kilmer what he would say if the plaintiff apologized, and received the answer that everything would be all right, and that the plaintiff would then receive extensive advertising from their company. The plaintiff declined to apologize, and Willis Kilmer said: " That settles it." Accordingly, the Kilmers organized a corporation and began the publication of the Binghamton *Press.* Willis Kilmer approached the city editor of the *Herald,* and attempted to hire him away from the plaintiff. He met with a refusal. Kilmer said: " Well, by God, I will tell you this, Mr. Spaulding, after the *Press* gets started your job on the *Herald* will be damned precarious. Your damned sheet won't live." Gradually the employees of the *Herald* left their employment and were engaged by the *Press,* which soon became a strong and popular newspaper. Among these employees were a cashier, a collector, a reporter, a mailing clerk, and an assistant mailing clerk. The Kilmers continued to exhibit animosity towards the plaintiff. They sought, without success, to induce an indorser upon promissory notes of the plaintiff or his newspaper company, to withdraw his name therefrom. On various occasions they expressed a desire to " get " him, and were disappointed that his newspaper continued so long to be published. In spite of the rivalry of the *Press* the *Evening Herald* continued its existence until the year 1910. However, its circulation and advertising during this period had fallen off greatly. In 1903 the *Evening Herald* had made a profit as high as $1,000 per month. For several years prior to 1910 the gross income of the *Herald* was so reduced that its newspaper was published at a loss. Prior to 1904 the *Herald* was free from debt, whereas by the year 1910 it had accumulated a large indebtedness. Prior to 1904 the salary of the plaintiff was $100 per week. His salary was reduced from time to time until it became but $40 per week. Finally, in the year 1910, the *Evening Herald* was sold for its debts and the plaintiff, losing his position as its editor and manager, was deprived of the substantial remuneration which he had been receiving. The Binghamton *Press* continued to be published after the year 1910, and so has continued until the present time. Jonas M. Kilmer died in the year 1912, and thereafter this action was brought. The plaintiff charges in his complaint that the loss of his position and salary was due to an unlawful conspiracy on the part of the defendants and Jonas M. Kilmer to cause him injury; that the Kilmers and Hadsell began and continued the publication of the Binghamton *Press* with the sole purpose in view of causing him injury; that as a result he sustained damages for which he demands a recovery. The evidence, viewed in the light most favorable to

the plaintiff, in a measure justifies this conclusion. Nevertheless, the trial justice before whom the case was tried dismissed the complaint at the close of the plaintiff's case, and this appeal was taken.

It is a principle of general application that a malicious motive does not render unlawful acts which in themselves are lawful. It was said by Judge Cooley in his work on Torts (Vol. 2 [3d ed.], p. 1505): "Bad motive, by itself, then, is no tort. Malicious motives make a bad act worse, but they cannot make that a wrong which in its own essence is lawful. 'An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent.' 'Where one exercises a legal right only, the motive which actuates him is immaterial.'" This statement correctly expresses the law of this State. (*Auburn & Cato Plank Road Co.* v. *Douglass*, 9 N. Y. 444; *Pickard* v. *Collins*, 23 Barb. 444; *Morris* v. *Tuthill*, 72 N. Y. 575; *Kiff* v. *Youmans*, 86 id. 329.) In the *Plank Road Company* case a farmer built a driveway in close proximity to and paralleling a plank road in order to afford opportunity to travelers to evade a toll-gate erected by the plank road company, and thus to escape the payment of tolls. It was held that this act, although performed for the sole purpose of injuring the plank road company, did not constitute a legal wrong. In the *Pickard* case it was held that the erection of a high fence, for the sole purpose of cutting off the light of a neighbor, was not actionable. In the *Morris* case it was held that the assignee of certain mortgages, who bought them and started foreclosures thereon for the sole purpose of injuring the mortgagor, committed no wrong and could not be denied the right to foreclose. It was said by Judge SELDEN in the *Plank Road* case: "But, independent of authority, if a malignant motive is sufficient to make a man's dealings with his own property, when accompanied by damage to another, actionable, where is the principle to stop? It will be found to apply to a thousand other cases with the same force as to this. For instance, if a man sets up a trade, not with a view to his own profit, but solely to injure one already established in the same trade, how can the case be distinguished in principle from this? * * * and yet no one would contend that an action would lie in these or similar cases." In *Allen* v. *Flood* (L. R. [1898] App. Cas. 1) decided by the House of Lords in the year 1897, the head note reads: "An act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action." In that case Lord WATSON said: "In my opinion it is alike consistent with reason and common sense that when the act done is, apart from the feelings which prompted it, legal, the civil law ought to take no cognizance of its motive." Sir Frederick Pollock, in his book

on Torts, newly edited in the year 1920 (11th ed. p. 23), says: " Harm done without excuse cannot be made more wrongful than it is by the addition of bad feeling or personal ill-will, nor made lawful by its absence." It has been said that an exception is found in that class of actions where damages are recoverable for maliciously inducing the employees of another to break their contracts of employment. (*Lumley* v. *Gye*, 2 E. & B. 216; *Bowen* v. *Hall*, L. R. 6 Q. B. Div. 333.) In *Quinn* v. *Leathem* (L. R. [1901] App. Cas. 495), decided by the House of Lords in 1901, Lord MACNAGHTEN in interpreting *Lumley* v. *Gye* (*supra*) and *Bowen* v. *Hall* (*supra*) in the light of the decision made in *Allen* v. *Flood* (*supra*), states that these cases were decided not on the basis of malice but upon the ground " that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognized by law if there be no justification for the interference." In a recent decision by our Court of Appeals (*Lamb* v. *Cheney & Son*, 227 N. Y. 418) the rule of *Lumley* v. *Gye*, as interpreted by Lord MACNAGHTEN in *Quinn* v. *Leathem*, was adopted as the law of our State. It was there held that if one party maliciously interferes with a contract between other parties, and induces one of them to break the contract, the party injured can maintain an action against the person so interfering. In speaking of the element of malice necessary to the maintenance of such an action, Judge McLAUGHLIN says: " It does not mean actual malice or ill-will, but consists in the intentional doing of a wrongful act without legal justification." He further states: " The gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof." It has recently been said by a distinguished jurist: " Today, most judges are inclined to say that what was once thought to be the exception is the rule, and what was the rule is the exception. A. may never do anything in his business for the purpose of injuring another without reasonable and just excuse." (The Nature of the Judicial Process, Cardozo, p. 25.) The case of *Lamb* v. *Cheney & Son* is cited as an authority for this statement, but it would scarcely seem that the broad generalization thus made is justified by the decision therein. In that case an outstanding legal right inuring to the plaintiff through his contract with another was intentionally destroyed by the defendant without justification on his part. The same generalization has elsewhere frequently been made. (*Mogul Steamship Co.* v. *McGregor*, L. R. 23 Q. B. Div. 598; *Aikens* v. *Wisconsin*, 195 U. S. 194; *Plant* v. *Woods*, 176 Mass. 492.) It has been noted, however, that without an explanation of what constitutes just cause or excuse

the generalization amounts to little more than the truism that no man is justified in performing an action for which he has no justification. Thus Lord HALSBURY (*Allen* v. *Flood,* L. R. [1898] App. Cas. 1, 75) in commenting upon a similar generalization made by BOWEN, L. J., in the *Mogul* case, stated: " The Lord Justice was too keen a reasoner not to observe that the words ' without just cause or excuse ' which he had used required exposition to render his reasoning complete." In any event it remains the law that a malicious motive does not convert a right into a wrong. The plaintiff must succeed, therefore, if at all, upon the theory that the defendants have intentionally caused him injury without justification. The case differs from *Lamb* v. *Cheney & Son,* in that the defendant, entering into the competition complained of, interfered with no legal right possessed by the plaintiff or the newspaper company which employed him. Even if we accept the generalization which has been made as stating the law of this State, we cannot see that this defendant was without justification in entering upon a rivalry with the plaintiff or his company. Thus it was said by FRY, L. J., in the *Mogul* case: " We have then to inquire whether mere competition, directed by one man against another, is ever unlawful. It was argued that the plaintiffs have a legal right to carry on their trade, and that to deprive them of that right by any means is a wrong. But the right of the plaintiffs to trade is not an absolute but a qualified right — a right conditioned by the like right in the defendants and all Her Majesty's subjects, and a right therefore to trade subject to competition. Now, I know no limits to the right of competition in the defendants — I mean, no limits in law. * * * But no case has been or, I believe, can be cited where the only means used by the defendant to injure the plaintiff has been competition pure and simple. I think that if we were now to hold interference by mere competition unlawful, we should be laying down law both novel and at variance with that which modern legislation has shown to be the present policy of the State." We think that the plaintiff must fail in the action for three reasons: *First.* The acts of competition complained of were not rendered unlawful by the malicious intention of the defendants to injure the plaintiff by performing them. *Second.* The defendants by their acts interfered with no legal rights possessed by the plaintiff or his employer. *Third.* The acts of competition complained of were not oppressive or unfair and were fully justified as an exercise of the lawful right of competition. We also consider that the acts complained of did not become unlawful or actionable because the persons engaged therein " conspired " to commit them. (*Brackett* v. *Griswold,* 112 N. Y.

454; *Cohen* v. *Fisher & Co.,* 135 App. Div. 238.) We, therefore, hold that the dismissal of the plaintiff's complaint was proper.

The judgment should be affirmed, with costs.

All concur, except HINMAN, J., dissenting, with a memorandum.

HINMAN, J. (dissenting):

As I understand the holding of Mr. Justice KELLOGG it is laying down the proposition that the right of competition is self-justification always; and that however destructive to another who is competing in the same business, he who engages in such business with no thought of business profits therefrom but for the sole purpose of destroying that of the other, need not defend himself by charging that he is doing so by way of self-protection or because in some manner he has been provoked so to do by the acts of the other. It is from this conclusion of law that I wish to dissent.

I am inclined to agree with the more recent thought expressed by Mr. Justice KELLOGG in his opinion holding to the proposition that one may not engage in and operate a business for the sole purpose of injuring another without reasonable and just excuse. It must, however, be a case of clear and unmixed malice. If that can be proved, I think there may be a recovery. This is a land of opportunity as well as of free competition in business and it becomes *pro tanto* a land of oppression where we lay down the fixed principle of law that a man who is wealthy enough and malicious enough can shut the door of opportunity to the object of his hatred by rivaling him in business with no other aim in view than his destruction, and be held to be in the exercise of his legal rights in so doing. Such an act of unmixed malice ought to be and I believe will be, held to be contrary to the prevailing public morality.

In this case the defendants may well have had just and reasonable excuse. Some newspapers take cowardly advantage of their power and when they do there is no more cogent method of defense than to engage in the newspaper business and " fight the devil with fire." Perhaps the jury would have so justified the act of the defendants, but that was an issue of fact to be determined by the jury.

Moreover it seems to me that the plaintiff's cause of action was not barred by the Statute of Limitations. (Code Civ. Proc. § 382.) The defendants began an attempt to injure the plaintiff in 1904, more than ten years before bringing the action, but the injury to the plaintiff did not accrue until the *Herald* sold its assets and went out of business in 1910, two years within the statute, the action having been brought in 1914.

The defendants acted as an agency of attempted destruction, slowly and insidiously accomplishing the result. It would seem to

me to be a question of fact as to whether it could be said that the purpose had been accomplished in whole or in part at any time prior to the time when the *Herald* went out of business. If the evil object was not accomplished there was no tort. There was always the chance that the defendants would not succeed until the damage was actually done. Under these circumstances the cause of action may not be deemed to have arisen until possibly 1910, depending upon the finding of the jury. It was not at any time a matter of direct or forcible trespass but something more to be likened to those indirect trespasses for which trespass on the case would lie at the common law. In trespass on the case no cause of action arose until the damage had been done. It was very different from the doing of an act and then having nothing further to do with it and no chance to stop the result of the act. The case here seems to parallel the situation covered in an action for alienation of a wife's affections. It was held in *Bockman* v. *Ritter* (21 Ind. App. 250; 52 N. E. Rep. 100) that a complaint for alienating a wife's affections stating that four years before defendant began to poison the wife's mind does not show it is barred by the two years' limitations when it appears that the wife did not leave her husband and declare she would no longer live with him until two weeks before suit commenced.

The case of *Skipwith* v. *Albemarle Soapstone Co.* (185 Fed. Rep. 15) also sustains this view of the plaintiff's case, the injury in that case not having been an obvious and necessary result of the defendant's operations until a time within the Statute of Limitations.

" When a permanent structure causes an overflow and resulting damage to another, limitations run against his claim from the time the obstruction is completed, if the nature and extent of the damage can be reasonably ascertained; but, if not, there may be as many successive recoveries as there are successive injuries developed." (*Chicago, R. I. & P. Ry. Co.* v. *Humphreys*, 107 Ark. 330; 155 S. W. Rep. 127.) This principle of successive recoveries is sustained in *Meruk* v. *City of New York* (223 N. Y. 271, 276) and in a long line of water damages in this State where the cause of injury was completed at a time against which the statute had run but the injuries continued within the period of the statute (*Colrick* v. *Swinburne*, 105 N. Y. 503; *Reed* v. *State*, 108 id. 407); and in the elevated railroad cases which hold that the statute is not a bar to damages suffered within six years. (*Galway* v. *Met. El. R. Co.*, 128 N. Y. 132.)

For these reasons I believe the judgment should be reversed and a new trial granted.

Judgment affirmed, with costs.