Follett, J.
The People, by their attorney general, 'seek by this action a judgment, annulling the contract entered into March 1," 1881, between four railroad corporations, and the proceedings taken thereunder for the consolidation of their capital stock, franchises and property.
Railroad corporations exist solely by virtue of the statutes, and can be consolidated only by enabling statutes. *
“No corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given” (1 H. 8. 600, § 3; same stat. 1 Id. 7th ed. 1531).
Before proceeding to discuss the questions involved it will be well to collate, a'nd to some extent attempt to analyze the statutes under which the consolidation is sought to be sustained by the defendants and condemned by the people.
*232 Chapter 917 oí the Laws óf 1869, as amended by chapter 94 of the Laws of 1880, provides :
“§1. It shall and may be lawful for any railroad .... corporation, organized under the laws of this State, or of this State and any other State, operating a railroad or bridge, .... partly within and partly withou't this State, to merge and consolidate its capital stock, franchises and property, with the capital stock, franchises and property of any other, railroad company - or companies organized under the laws of this State, .... whenever the two or more railroads of the .... corporations so to be consolidated shall or may form a continuous line of railroad with each other, or by means of any intervening railroad, bridge or ferry.”
“ § 2. Said consolidation shall be made under the conditions, provisions and restrictions, and with the powers hereinafter in this act mentioned and contained, that is to say :
1. “The directors of companies proposing to consolidate, may enter into a joint agreement under the corporate seal of each company, for the consolidation of the said companies and railroads, and prescribing the terms and conditions thereof, the inode of carrying the same into effect, the name of the new corporation, the number and names of the directors and other officers thereof, and who shall be the first directors and officers, and their places of residence, the number of shares of the capital stock, the amount of par value of each share, and the manner of converting the capital stock of each of the said companies into that of the new corporation, and how and when directors and , officers shall be chosen, with such other details as they shall deem necessary to perfect such new organization, and the consolidation of said companies or railroads. ■
“But in no case shall the capital stock of the company formed by such consolidation exceed the sum *233 of the capital stock of the companies so consolidated, at the par value thereof.
“Nor shall any bonds or other evidences of debt be issued as a consideration for, or in connection with such consolidation.,”
§ 9. No ... . corporations of this State whose railroads run on parallel or competing lines, shall be authorized by this act to merge or consolidate.”
The last clause of section 1 was amended August 12, 1881 (L. 1881, c. 685), so it now reads :
“ Whenever the railroad or branches, or any part of the railroad or branches of the companies or corporations so to be consolidated, shall or may form a continuous or connected line of railroad with each other, or by means of any intervening railroad, bridge or ferry.”
But as the consolidation proceedings under consideration were prior to the amendment, it is not applicable to this case.
Chapter 108 of the Laws of 1875 relates to the consolidation of corporations having lines " located and wholly unconstructed. It was conceded by both sides, on the argument, that this case does not fall within this statute.
The various provisions of the statute may be classified as follows:
1. The conditions which must exist before power is granted to consolidate.
2. The restrictions or provisos limiting the power granted. »
3. The procedure by which consolidation is to be effected. The parts of the statute not quoted contain additional provisions in relation to procedure, and provisions as to the effects of consolidation and to the powers conferred upon consolidated corporations. The view taken of this case renders it unnecessary to consider the parts of the statute not quoted. The conditions which must exist to authorize the consolidation, are *234 specified in the first section. The restrictions and limitations upon the power given in general terms, by the first section, are contained in the last two sentences of subdivision'one of section two, and in section nine above quoted.
Considering the questions in the order in which they appear in the statute, the first question is: Did the conditions exist, authorizing the consolidation sought to be effected 'i
For a complete understanding of this question, a minute and somewhat prolix statement of the conditions existing seems necessary.
March 1, 1881, the Boston, Hoosac Tunnel & Western Railway Company, the Hoosac Tunnel & Saratoga Railway Company, the Utica & Syracuse Air Line Railway Company and the Mohawk & Lake Erie Railway Company excuted a contract by which they agreed to consolidate their capital stock, franchises and property, and create a new corporation under the name of the Boston, Hoosac Tunnel & Western Railway Company, with a capital stock of $25,000,000. The contract, in terms, embraced the Syracuse, Chenango & New York Railroad Company, and the Syracuse, Phcenix & Oswego Railroad Company, and prescribed the terms upon which the stock, franchises and property of these corporations should be merged and brought into the new corporation. But the agreement was not excuted by the two corporations last named.
For convenience, the corporations executing the agreement are called constituents.
The stockholders of the Hoosac Tunnel & Saratoga, Railway Company, of the Utica & Syracuse Air Line Railway Company, and of the Mohawk & Lake Erie Railway Company adopted the agreement April 4,1881, and the stockholders of the Boston, Hoosac Tunnel & Western Railway Company adopted it April 9, 1881. The agreement and ratification proceedings were -filed *235 in the office of the secretary of state, April 11, 1881; when they were filed with the secetary of state of the State of Vermont, does not appear. The original Boston, Hoosac Tunnel & Western Railway Company was incorporated under the laws of the States of New York and Vermont, and at the date of the attempted consolidation operated about forty miles of road, partly within this State and partly within the State of Vermont. The routes or lines of the four constituent corporations are described in their several articles of incorporation, substantially as follows:
1. The Boston, Hoosac Tunnel & Western Railway Company’s route or line begins at a point in the town of Pownal, in the State of Vermont, in the boundary line between the States of Vermont and Massachusetts, extending thence nor th-wes twardly for six miles in the State of Vermont, crossing the west boundary line thereof into the State of New York; thence extending wes twardly through the county of Rensselaer, crossing the Hudson river at Mechanicsville ; thence extending wes twardly through the counties of Saratoga, Schenectady, Montgomery, Herkimer, Oneida, Oswego, (passing north of Óneida Lake,) into the county of Cayuga, and terminating atan undefined point on Lake Ontario. Also, a route or line in the State of Vermont, beginning ata point in the town of Pownal, in the State Vermont, where the above described line crosses into the State of New York ; thence northwardly for about fourteen miles through the towns of Pownal, Bennington and Shaftsbury, in Vermont, to another point in said last named town on the west line of the State of Vermont.
' 2. The Hoosac Tunnel & Saratoga Railway Company’s route or line begins at the city of Troy, thence extending northwardly on the east side of the Hudson river to Mechanicsville; thence crossing the Hudson river on the bridge of the Boston, Hoosac Tunnel & *236 Western Railway Company, to the west side of said river; thence extending northwardly in Saratoga county to Saratoga Springs. Also, a route or line beginning at a point near Pish creek, in the line last described; thence extending eastwardly in Saratoga county to the Hudson river, near Schuylerville.
3. The Utica & Syracuse Air Line Railway Company’s route or line begins in the city of Utica, at a point in the located line of the Boston, Hoosac Tunnel & Western Railway Company, the Utica, Clinton & Binghamton Railroad, and the Utica, Chenango & Susquehanna Valley Railroad, either or all of them; thence extending west fifty miles in the counties of Oneida, Madison and Onondaga, to the Syracuse, Binghamton & New York Railroad, to the Syracuse & Chenango Railroad, and to the Syracuse, Phcenix & Oswego Railroad, either or all of them in the city of Syracuse.
4. The Mohawk & Lake Erie Railway Company’s route or line begins in the city of Syracuse, thence extending westwardly in the counties of Onondaga, Cayuga, Wayne, Ontario, Monroe, Grenesee and Erie, to Buffalo and to the International Bridge. Also, a route or line, from ,the line last described, to the city of Rochester.
If the proceedings for the consolidation of the above described four corporations are valid, the consolidated corporation embraces the following routes or lines which are redescribed, for the purpose of clearly showing the relations of the several lines to each other, and the situation of the consolidated line:
A. A route or line beginning at a point in the town of Pownal, in the state of Vermont, thence extending north-westwardly for six miles in that State, and to the west line thereof; thence extending north-westwardly in the State of New York, crossing the Hudson river at Mechanicsville ; thence extending south-westwardly to the city of Schenectady ; thence westwardly *237 through the cities of Utica and Syracuse, and terminating at the city of Buffalo, and at the International Bridge.
B. A route or line beginning at a point in the town of Pownal, in the west line of the State of Vermont, at a point where the consolidated line crosses into the State of New York, thence extending northwardly for about fourteen miles through the the towns of Pownall, Bennington and Shaftsbury, in Vermont, to a point in the last named town in the west line of Vermont.
C. A route or line beginning at the city of Troy, thence extending northwardly on the east side of the Hudson river to Mechanicsville; thence crossing the Hudson river on the bridge of the Boston, Hoosac Tunnel & Western Railway Company, to the west side of said river; thence extending northwardly in Saratoga county to Saratoga Springs.
B. A route or line beginning in the line last described at a point near Fish creek, thence extending eastwardly in Saratoga county to the Hudson river near Schuylerville.
E. A route or line beginning at the city of Utica and ■ extending westwardly through the counties of Oneida, Oswego, passing north, of Oneida Lake into the county of Cayuga, and terminating at an undefined point on Lake Ontario, which line is the western portion of the line of the Boston, Hoosac Tunnel & Western Railway Company (constituent).
F. A route or line beginning at a point on the main line (A) and extending to the city of Rochester.
In construing statutes, words are to be taken in their natural and obvious sense, unless it is apparent that they are used in a technical sense, in which case the technical meaning prevails (Sedgw. Stat. & Const. L. 220).
The words of this statute will be given their ordinary and popular signification, in which sense they were *238 used by the legislature. It is contended that all connected lines are continuous, no matter how connected, or how divergent; and may be consolidated unless they are parallel or competing. It is said that “ trains might run from either end of either branch, without interruption,' to either end of the main line.” This may be said of all roads which connect and have the same gauge.
The fallacy of this proposition consists in the assumption that all connected lines are continuous, because connected. A connection of lines is a prerequisite of continuity of lines, or otherwise stated, two or more lines or routes cannot be continuous without being connected ; but the mere fact of connection does not, in the technical or statutory sense, form a continuous line. The phrase, “form a continuous line of railroad with each other,” means a line or route extending and continuing in substantially the same general direction, connecting two principal points. Undoubtedly the term would not prevent, and was not intended to prevent, a road with unimportant branches forming no considerable part of the general plan, from consolidating with another corporation, if the lines of both, within the definition above given, form one main and continuous line. The general direction of the route or line of the Boston, Hoosac Tunnel & "Western Railway Company (constituent), is east and west, and embraces no part of the routes or lines of the Hoosac Tunnel & Saratoga Railway Company. The general direction of the principal route “C” of the Hoosac Tunnel & Saratoga Railway, is north and south, and of its lateral line “ D ” east and west.
No part of either line “C” or “D” forms any part of the main consolidated route. The principal line, “C,” and the line of the Boston,,Hoosac Tunnel & Western Railway (constituent), are intersecting lines and do not in any sense form a continuous line. *239 Neither do the routes of the Hoosac Tunnel & Saratoga Railway Company form a continuous line of railroad with one or more of the routes of the other constituents, and it is impossible to combine all or any of the routes of the other constituents with either of the routes of the Hoo;*uc Tunnel & Saratoga Railway Company, so as to form a continuous line of railroad within the meaning of the statute.
The term “may form a continuous line of railroad” excludes the idea of plurality of lines, and conveys the idea that the consolidated line must must form one, instead of two or more lines of railroad.
Is the consolidation of the Utica & Syracuse Air Line Railway Company with the Boston, Hoosac Tunnel & Western Railway Company (constituent), prohibited by the ninth section ?
§9. “No . .'. . corporations of this State whose railroads run on parallel or competing lines, shall be authorized by this act to merge or consolidate.”
The routes or lines of these corporations connect at Utica, thence diverging, both extending in a westerly-direction, one passing north, and the other south of Oneida Lake. The greatest distance between these two routes or lines does not exceed twenty-five miles. The evidence does not disclose the length of the route of the last named corporation, from Utica to Little Sodus Bay on Lake Ontario, but it cannot be less than eighty miles. The Utica & Syracuse Air Line Railway’s route extends from the located line of the Boston, Hoosac Tunnel & Western Railway in Utica, to Syracuse, a distance, as stated, of fifty miles.
While it is apparent that these two' routes or lines are not parallel in a mathematical sense, I think they are within the meaning of the statute, and for that reason cannot be consolidated.
It is a rule for the construction of statutes, that “and” and “or” are convertible, as the sense of the *240 statute may require ; but if it be conceded that “or” after the word “parallel” should be read “ and,” it is difficult to see how the change would help the attempted consolidation. ■
Competing roads are those which are rivals in business. The Boston, Hoosac Tunnel & Western Road (constituent), ends at Lake Ontario,' and was designed to secure business between the east and west, as well as local business.
The Utica & Syracuse Air Line Road is locally a competing road for a large part of its length, and through its connection, a competing road for business originating beyond its line.
If it be said that the ninth section only prohibits the consolidation of corporations having parallel railroads, constructed roads, it destroys the position of the defendants, that the statute authorized the consolidation of a corporation having a railroad partly constructed, with corporations whose routes are located, and with corporations whose lines are not located or defined, except in the articles of incorporation. The first section does not mean one thing in this connection, and the ninth section a wholly different thing in the same connection.
Neither do these two roads form a continuous line of railroad with each other, or with all of the others sought to be consolidated.
Again, the routes of these two corporations being parallel for the entire length of the Utica & Syracuse Air Line, form two instead of one line of road for the entire length of the route of the last named corporation. The Utica & Syracuse Air Line Road does not form a continuous line with the line of the Hoosac Tunnel & Saratoga Railway in connection with the routes of the other constituents, for the reasons given when discussing the relation which the route of the last named corporation bears to the route of the Boston, Hoosac *241 Tunnel & Western Railway, and to the proposed consolidated route.
It is urged that the statute under consideration, and chapter 685, Laws 1881, being in pari materia should be construed together, and the last act accepted as declaratory ; that the policy of the law is to permit the consolidation of routes or lines bearing the relation to each other which these lines bear.
The amendment of 1881 does not, as I read it, authorize the consolidation of all non-competing roads which touch or cross each other. Possibly it may be broad enough to have authorized (had it been then enacted) the consolidation of the corporations signing the agreement, excepting the Hoosac Tunnel & Saratoga Railway Company, which cannot be consolidated with the other constituents under any of the statutes of this State. It is not considered important to consider the relation which the other short intersecting lines or routes, called branches, embraced in the proposed consolidated line, bear to the lines of the constituents, or to the consolidated line.
Does the plan of consolidation violate the provision: “Nor shall any bonds or other evidences of debt be issued as a consideration for, or in connection with this consolidation”? The consolidation agreement states in terms, that bonds shall not be issued as a consideration for, or in connection with this consolidation, and in the next sentence provides: “But it is agreed that bonds may be issued, secured by mortgage, at the rate of $50,000 per mile on the double track completed railway, and equipments of said •consolidated road.”
At the date of the consolidation, the Boston, Hoosac Tunnel & Western Railway Company, (constituent,) owed a floating debt of about $1,900,000, and had issued capital stock to the amount of $478,900.
A large majority of the stock and debt was owned or *242 controlled by Frederick L, Ames and F. Gordon Dexter. By the contract of February 9, 1881, Ames' and Dexter agreed to sell to Burt a controlling interest in this stock and debt for cash at its par value.
March 1, 1881, the consolidation agreement was signed by the four corporations.
April 4, 1881, the stockholders of all the corporations, except the stockholders of the Boston, Hoosac Tunnel & Western Bailway Company (constituent), adopted the agreement, and nothing was lef t to be done except to secure its adoption by the stockholders of the Boston, Hoosac Tunnel & Western Bail way Company (constituent), which was secured April 9, 1881.
On the same day (April 9, 1881), and before the consolidation was voted (the contract speaks of the ratification as a thing to be' thereafter done), Ames and Dexter, by the contract of that date, agreed to cause the consolidation agreement to be ratified by the stockholders of the Boston, Hoosac Tunnel & Western Bailway Company, at a meeting to be held that day, or at some adjournment thereof, upon the following conditions among others :
“The entire first issue, to wit: $6,000,000 of the first mortgage bonds of said 'consolidated company (said bonds being already engraved and the mortgage prepared), and all of the shares of the capital stock, shall be delivered to and held by the said Ames and Dexter, as trustees, as security for the performance by said Burt of all the provisions of this agreement, and also the agreement of February 9, 1881.”
On the same day, Foster (the president of the construction company), guaranteed the performances of this contract by Burt, and thereupon Ames and Dexter, who owned or controlled at least two-thirds of the stock and debts of the Boston, Hoosac Tunnel & Western Bailway Company (constituent), voted to ratify the consolidation.
*243 The contract of April 9, 1881, further provided that two-thirds of the capital stock of the several constituents should be transferred to and held by Ames and. Dexter, or some person selected by them ; that they should have a majority of the directors, of the consolidated corporation, and full control thereof until their stock and debt should be paid for.
April 11, 1881, the ratified consolidation agreement was filed in the office of the secretary of state, at Albany. On the same day, the mortgage upon the consolidated corporation (which had been prepared and the bonds engraved before April 9, 1881), was executed. Six million dollars of the bonds were issued, certified and delivered to Ames under the contracts, and by him deposited with the Central Trust Company.
About May 25, 1881, the Continental Construction & Improvement Company paid Ames and Dexter the amount due them under the contracts of February 9 and April 9, 3881, received the bonds and now hold them.
From these facts the conclusion is irresistible that these bonds were issued in connection with and as a consideration for the consolidation.
The ends sought to be attained by the restrictive clause under consideration, are:
I. To provide for the equalization of the values of the properties of the constituents by means of stock,'to be issued pursuant to the terms of the consolidation agreement, and not by bonds issued to either constituent, or for the benefit of the stockholders of either.
II. To secure the submission of the joint agreement (setting forth the terms of consolidation) to the unbiased judgment of the stockholders, to be by them ratified or rejected, upon the intrinsic merits of the plan, uninfluenced by collateral considerations."
It is no answer to say that these bonds were issued *244 to pay a debt of $1,900,000 due Ames and Dexter (from this corporation having less than forty miles of single track), for such was not the sole consideration.
It may be that the issue of bonds in good faith to pay the just debts of a solvent constituent, is not within the reason of the prohibition, though issued in connection with the consolidation. But, apart from this consideration, these bonds were issued and used for the avowed purpose of raising money wherewith to pay the assenting stockholders par for their stock, as a consideration for their assent, without which they refused to assent, and thereby promoting the very mischief which this clause was designed to prevent.
Does the consolidation agreement violate the following statutory provision ? ‘ ‘ But in no case shall the capital stock of the company formed by such consolidation exceed the suin of the capital stock of the companies so consolidated, at the par value thereof.”
Article 4 of the consolidation agreement provides : “The capital stock of said consolidated corporation shall not exceed the sum of the capital stock of the companies hereby consolidated at the par value thereof, and said capital stock is hereby fixed at the sum of $25,000,000, which shall be divided into 250,000 shares of the par value of $100, each.”
The authorized or nominal capital stock of the four constituents, amounts to $23,500,000, being 1,500,000, less than the capital stock fixed in the consolidation agreement.
The defendants assert that all of the provisions of the consolidation agreement, read together, disclose the intent to fix the capital stock at $23,500,000, to which sum they now offer to reduce it.
The practical construction of the consolidation agreement by the defendants, is not in accordance with this assertion.
*245 The stock to be issued to the stockholders of the constituents, by the terms of the consolidation agreement, amounts to . $503,290
The subscriptions of Burt and Gaddis (see article 6 of the construction contract), amount to ...... 1,644,300
The subscription of the construction company (see article 6 of construction • contract), ... ... . 23,028,400
Total amount of stock subscribed for . $25,175,990 The stock was to be paid for by the construction company, as follows :
Immediately ...... $2,100,000
At the completion of their contract . . 20,928,400
Amount paid in by Burt and Gaddis on their subscriptions .... 176,000
Remainder due on subscriptions of Burt and Gaddis, to be paid by the construction company at the completion of their contract ....... 1,468,300
Amount of stock of constituents paid in before consolidation .... 503,290
Amount paid and agreed to be paid for capital stock ...... $25,175,990
The two amounts above specified to be paid for stock at the completion of the road $20,928,400 And ........ 1,468,300
Equal ....... $22,396,700
—which is the amount the railroad company agreed to pay the construction company for the completion of the road in addition to all of the bonds to be issued. (Articles 1, 2 and 3 of construction contract.)
The reason of this restrictive clause now under consideration, is to prevent an unlimited increase of capital *246 stock in such cases. If stock can be increased by $1,500,000, and the proceedings not vitiated thereby, it can be increased by any amount, and the evil can be prevented only by an action.
It is urged that the statute should receive a liberal construction, and the rule is invoked, that the court should be astute, curious and cunning to so construe it as to prevent a forfeiture.. The extent of the rule is, that if a statute is susceptible of two constructions, one which saves, and the other which destroys, the former should be adopted. The validity of the statute is not in question.
This is not a statute creating a penalty, or imposing a forfeiture of existing rights of corporations. And the rules for the construction of such statutes are inapplicable to this.
The rule that statutes prescribing the proceeding to be taken to incorporate companies shall receive a liberal construction, is well settled, and is founded on the plainest principles of justice. A substantial compliance with such proceedings is sufficient. This rule, so far as it is applicable to corporations formed under general laws, is recognized by chapter 135, Laws 1870, which authorized an amendment of the articles in such respects. The questions involved in this contention (so far as discussed in this opinion), are not those of regularity or irregularity of procedure, but (1) whether the conditions precedent existed, which under the statute, must have existed to enable the corporations to consolidate; (2) whether the case falls within the restrictive clauses of the statute.
' Upon the first question the statute must be strictly construed, for it grants great and unusual power to private cprporations. It is against the policy of the law to construe statutes, so as to create monopolies, or confer upon corporations powers not expressly conferred by statute, or necessarily incident to their business *247 (Charles River Bridge v. Warren Bridge, 11 Pet. 420 ; Auburn & Cato Plank Road Co. v. Douglass, 9 N. Y. 444; Sedgw. Stat. & Const. L. 291). Expections and' restrictive clauses-, like provisos, are to be strictly construed, so as not to take a case within the general terms of the statute, out of it, unless the case is clearly excepted by the restrictive clause, is within the reason thereof, and within the intent of the legislature. The restrictive clauses hereinbefore quoted and discussed, are not preceded by thé word “provided” or “except,” but considering the positive and prohibitory language in which they are framed, they must have a like effect. They clearly impose restrictions and limitations upon the exercise of the power (Wilberforce on Statutes, 300 to 305). “ The rule is, that where a general intention is expressed, and the act expresses also a particular intention incompatible with the general intention, the particular intention is to be considered in the nature of an exception” (Churchill v. Crease, 5 Bing. 180; De Winton v. Mayor, &c. of Brecon, 26 Beav. 533-543 ; Pretty y. Solly, Id. 606-610; Wilberforce Stat. 290-293). “ A proviso in deeds or- laws is a limitation "or exception to a grant made, or authority conferred, the "effect of which is to declare that the one shall not operate, or the other be exercised, unless in the case provided” (Voorhees v. Bank of United States, 10 Pet. 449 ; Wayman v. Southard, 10 Wheat. 1-30; Minis v. United States, 15 Pet. 423).
The issue and disposal of bonds for the purposes mentioned, and the over-issue of stock described, are clearly within the reason of the restrictive clauses, and are expressly within the terms of those clauses. Had the conditions existed, authorizing the constituents to consolidate, the power could only be legally" exercised subject to the restrictions. If this statute is broad enough to authorize the consolidation of these various corporations, a large portion of the railroads intersect *248 ing, or diverging from the great railroads of this State, may be embraced in a single corporation. Such was not the intention of the legislature.
‘This discussion might be concluded at this point, and the judgment rested upon purely legal grounds, but a few words on the merits will not, I think, be inappropriate.
The mortgage executed in connection with the attempted consolidation, is not, on its face, a just mortgage.
It specifically incumbers:
1. The lines and property of the four constituents.
2. The corporation’s right to use the Troy & Greenfield Road in Massachusetts.
3. The Syracuse, Chenango & New York Railroad.
4. The Syracuse, Phoenix & Oswego Railroad.
5. Such roads as the corporation may construct or acquire to the coal fields in Pennsylvania.
6. Such roads as the corporation may construct or acquire from the Troy & Greenfield Railroad to the city of Boston.
7. Such roads as the corporation may construct or acquire from a point near Schenectady to the city of New York or elsewhere.
8. All property thereafter to be acquired by the corporation, wherever situated.
The corporation did not, at the date of the mortgage, own, and has not since acquired, the Syracuse, Chenango & New York Railroad, or the Syracuse, Phcenix & Oswego Railroad, and had no right to incumber either. By what authority the corporation proposes to construct a line to the coal fields, a line in Massachusetts, a line from Schenectady to New York or elsewhere, does not appear. None of the constituents were authorized to construct them. If these lines should be constructed by other corporations in the interest of the consolidated corporation, the mortgage *249 would not become a lien upon them. Should these lines be constructed and leased, the mortgage, at most, would become a lien on the lessee’s interest.
The mortgage secures the payment of bonds, to be issued thereunder, as follows :
$6,000,000 at the date of the mortgage ; this was at the rate of more than $150,000 per mile for each mile of single track then constructed, exclusive of the track of the Syracuse, Chenango & New York Railroad, which it had no right to mortgage.
For all track constructed, after the date of the mortgage, at the rate of $75,000 per mile for each mile of triple track, not less than five continuous miles in. length.
$50,000 per mile for each mile of double track. $25,000 per mile for each mile of single track.
$20,000,000 of the remaining bonds may be issued in advance of the actual completion of mileage, to be disposed of at such time or times and at such prices, as the corporation may fix, upon the condition that the net proceeds be paid to or received by the mortgage trustee, to be paid over to the railroad at the mileage rate aforesaid.
Neither are the bonds just bonds. They recite that the issue is limited to $50,000 per mile of double track of railway built and to be built. This is not true. The bonds contain no reference to the right to issue $6,000,000 at the date of the mortgage, the right to issue bonds upon triple and single tracks, or the right to issue and sell $20,000,000 of the remaining bonds at any time.
Whether so intended, or not, the mortgage and bonds are deceptive as to the security offered to purchasers.
The only cash subscription to the stock of the consolidated company was one of $2,100,000, made by the Construction Company. The remainder of the stock *250 (except that which belonged to the stockholders of the constituents, and possibly the subscriptions of Burt and Gfaddis), was to be issued to the Construction Company upon the completion of its contract. August 11, 1881, the Construction Company authorized the sale of $2,000,000 of the bonds at par and accrued interest, allowing one per cent, commission and expenses of advertising for making the sale. A sale not being effected, November 3, 1881, one of the directors was authorized to sell $6,000,000 of the bonds at ninety-five per cent, and accrued interest, and receive as a commission therefor $100,000 cash and $250,000 in the stock in the railroad ; with the right of the purchaser of the $6,000,000 to take $14,000,000 at ninety-seven and a half per cent, and accrued interest: the person negotiating the sale of the $14,000,000 to receive á further commission of $100,000 cash and $250,000 in the stock of the railroad. For each $1,000 paid in towards the stock of the Construction Company by its shareholders, they were to receive a stock certificate for $2,000 marked half-paid, and $1,000 in the bonds of the railroad, which were to be sold by the Construction Company, the proceeds divided among the stockholders, and all bonds unsold January 1, 1883, were to be distributed among the shareholders of the Construction Company.
It is apparent that the design was to build the road by proceeds derived from the sale of its bonds. The construction of the works of corporations with little or no cash capital, by means of bonds resting mainly on a foundation no more substantial than the hopes or imaginations of the promoters, and dependent for success upon their ability to sell the bonds to investors, has in practice to a great extent superseded the theory of the law, that issued shares that represent their par value in money or money’s worth, paid into the treasury of the corporation, and that bonds are to be issued only *251 when the capital stock is insufficient to complete the enterprise.* This practice has brought loss to the investors and discredit upon this class of securities. The formation of corporations upon this method, and for this purpose, should not receive the approval of the courts in any case not clearly authorized by the statute.
It is said that these considerations cannot affect the case. “That the wrong must be one affecting the public at large and not private individuals alone. Neither the State nor the attorney general is constituted the guardian of public'morals.”
Without stopping to discuss this proposition, or its applicability to this case, it is sufficient to say, that statutory authority for this action is found in section 1948 of the Code of Civil Procedure, and ample justification for its prosecution in the evidence.
A judgment is directed, declaring that the attempted consolidation of the four constituent companies is illegal and void; that a new consolidated corporation under the name of the Boston, Hoosac Tunnel & Western Railway Company, has not been created, and that the individual defendants be forever restrained from, exercising any corporate rights, privileges or franchises under and in pursuance of the attempted consolidation.
[Directions as to attendance of counsel for settlement of the judgment are omitted.]

 The right to issue stock as full-paid, in payment for the. construction of the road, was established in Van Cott v. Van Brunt, 82 N. Y. 535; reversing in effect 2 Abb. N. C. 283.